THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
VIRGIL ROBINSON, a/k/a Cody Robinson, Defendant-Appellant.

First District (5th Division)    No. 79-1487

Opinion filed December 19, 1980.

Elliot Samuels, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Marica B. Orr, Pamela L. Gray, and John M. Hynes, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE SULLIVAN delivered the opinion of the court:

After a jury trial, defendant was convicted of murder and given a sentence of 200 to 600 years. On appeal, he contends that his warrantless arrest made inside his home should have been quashed; that he was denied a fair trial by evidence that he attempted to escape from custody; and that he was prejudiced by comments made in the prosecution's rebuttal argument.

It appears that in September 1977, defendant and Renee Jones (his girl friend) were on trial for the armed robbery of Tyrone Taylor and, on September 21, after completion of the direct examination of Tyrone, the

trial was adjourned until the next day. Later that day, Steven Taylor (stepfather of Tyrone) was shot at the door of his apartment and died later of the wounds. Then, on September 25, a warrantless arrest was made of defendant in his father's apartment.

Prior to trial, defendant moved to quash his arrest and suppress evidence derived therefrom. At the hearing on the motion, Renee Jones testified that on September 25, 1977, she and defendant were in bed in defendant's parents' apartment when two or three police officers knocked on the front door and identified themselves; that she heard defendant's sister let the officers in; that they searched the apartment and found a gun, after which defendant was placed under arrest. Defendant testified that it was his father who opened the door in response to the knocking of the police officers; that two officers entered—one of whom came into the bedroom and the other opened the back door to allow other policemen to enter; that an officer found a gun in the bedroom, and he was then arrested and transported to the police station where his finger and palm prints were taken. Officer Yucaitis testified that after receiving information that other police officers had stopped defendant's car on the evening of September 21 in the vicinity of the Taylor killing, he obtained defendant's rap sheet from which he learned that defendant previously used the name of "Cody"; that on the morning of September 25, he was told by Benny Liggins, the victim of a July 16 murder attempt, that the man who shot him was from the neighborhood; that he knew him only as "Cody"; and that he made a photographic identification of defendant as his assailant. After the Liggins interview, Yucaitis (along with three other officers) went to defendant's residence, where he and his partner went to the rear door and two other officers to the front door; that there was knocking at the front door, and he heard Officer Dignan say, "Police officers," following which there were sounds of the movement of people and furniture in the apartment and then he and his partner were admitted through the back door; that defendant's father said he was not there, but a small child pointed to the bedroom and said, "He's in there"; and that defendant was arrested after he was found hiding in the bedroom. The court denied the motion to quash and suppress.

The evidence at trial relevant to the issues raised was as follows. Rosalie Taylor, the wife of Steven and the mother of Tyrone, testified that on September 21, 1977, her husband answered the doorbell of their apartment and she then heard two or three shots—after which he said, "Call the police, I'm shot." Police officer Hodges testified that when he arrived at the scene of the shooting, Taylor (who was lying on the hallway floor) told him that he had opened the apartment door and was shot by a black male wearing a stocking over his face. There was additional testimony that a palm print taken from the door of the Taylor apartment

was determined to be that of defendant; and that two .38-caliber bullets in the body of Taylor were the cause of his death.

Leroy White, a State's witness, essentially testified that on the evening of September 21 he and defendant were in the latter's car talking about his being on trial for the armed robbery of Tyrone Taylor; that defendant obtained a .38-caliber revolver from an acquaintance who was passing by; that he and defendant then drove to Renee Jones' home, where she gave defendant an address at 77th and Essex[1] and a pair of pantyhose; that at about 9 p.m. defendant's car was stopped by police in the vicinity of the Taylor residence, and they were told by the police to leave the area; that about an hour later they returned, and defendant took the pantyhose and revolver and went to the Taylor apartment; that he (White) heard two gunshots, following which defendant returned to the car; that defendant later told someone in White's presence that he had "taken care of the victim"; and that he (White) went to court on the following day with defendant for his pending trial and that, when he saw a man in the hallway, defendant said, "Damn, I must have made the wrong hit."

Police officer Thompson testified that he observed defendant's car on three occasions on the evening of September 21 in the vicinity of 77th and Essex and, eventually, stopped it at 8:55 that evening on 78th Street near Phillips Avenue (a short distance from 7737 Essex), and he identified defendant as the driver of the vehicle.

Officer Dignan testified that at approximately 9:30 a.m. on September 25, he and other officers went to defendant's residence; that after he knocked on the front door and announced his office, he heard talking and movements of people and furniture inside the apartment; that about five minutes later, defendant's father answered the door, whereupon he identified himself as a police officer and stated that defendant was wanted by the police; that defendant's father initially said nothing; but then said defendant was not there; that a young child standing next to defendant's father pointed to the bedroom and said that defendant was there; and that he and the other officers then found defendant in the bedroom and arrested him. Defendant was sentenced on October 25, 1977, and three deputy sheriffs gave testimony that later, on October 25 and again on November 19, 1977, defendant attempted escapes from custody.

Elvira Echols, the victim's daughter, testified for defendant that about 8:30 p.m. on the evening of the murder, a stranger came to the building where she and her parents lived looking for one Michael Evans and then left.

---

[1] The Taylors resided at 7737 South Essex.

Opinion

Defendant first contends that the warrantless arrest in his home was illegal and therefore the palm print taken from him at the police station following the arrest should have been suppressed. He relies principally upon *Payton v. New York* (1980), 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371, which holds that in the absence of exigent circumstances a warrantless and nonconsensual entry into a suspect's home to make an arrest is prohibited by the fourth amendment.

We initially note the retroactivity of *Payton* is not an issue here, as we believe that *Payton* did not alter the law in Illinois governing warrantless entries into homes for the purpose of making an arrest. In *People v. Abney* (1980), 81 Ill. 2d 159, 407 N.E.2d 543, our supreme court determined the validity of the provisions of the Illinois arrest statute, which authorized entries to arrest when probable cause is present (Ill. Rev. Stat. 1977, ch. 38, pars. 107—2(c), 107—5(d)), in the light of *Payton*. The court reasoned:

> "Although the opinions of this court which have upheld warrantless entries seem merely to echo the words of the statute, a close examination of the cases reveals that factors in addition to probable cause were present in each which rendered the police activity reasonable under the circumstances within the meaning of the constitutional provisions governing the arrest of persons [citations]. Although this court in [*People v.*] *Johnson* [ (1970), 45 Ill. 2d 283, 259 N.E.2d 57], [*People v.*] *Sprovieri* [ (1969), 43 Ill.2d 223, 252 N.E.2d 531] and [*People v.*] *Barbee* [ (1966), 35 Ill. 2d 407, 220 N.E.2d 401] did not use the phrase 'exigent circumstances' and even expressed some doubts about the exigent-circumstances requirement [citation], it appears that the principles of the exigent-circumstances rule were adopted in those cases and that the requirements of the rule, by virtue of constitutional restrictions, have been judicially engrafted upon the statute. The statute, as construed, is in compliance with the constitutional guidelines enunciated in *Payton*." (81 Ill. 2d 159, 167-68, 407 N.E.2d 543, 547.)

In *People v. Genus* (1979), 74 Ill. App. 3d 1002, 1013, 393 N.E.2d 1162, 1170, defendant argued that absent a warrant or exigent circumstances an officer may not enter a citizen's home for the purpose of making an arrest, and this court stated, "[D]efendant's argument and citation of authority, in our opinion, overlook consent to the officer's entry as an established exception to the warrant requirement of the fourth and fourteenth amendments." Reading *Abney* and *Genus* together, we are of the opinion that prior to *Payton*, in this jurisdiction, a warrantless entry into a citizen's home to make an arrest did not violate the fourth amendment if exigent circumstances were present or the entry was consensual. Thus, the

principle enunciated in *Payton* merely reaffirms the position previously taken by our courts.

■■ The existence in the instant case of probable cause to arrest is undisputed; but, as defendant's arrest was without a warrant, we are concerned with questions as to whether the entry into his home was with consent or whether exigent circumstances existed. On a motion to quash an arrest, the burden of proof is upon the defendant (*People v. Potts* (1978), 58 Ill. App. 3d 550, 374 N.E.2d 891; *People v. Thomas* (1977), 47 Ill. App. 3d 402, 362 N.E.2d 7), and a reviewing court will not disturb the conclusion reached by the trial court unless it is "manifestly erroneous" (*People v. Clay* (1973), 55 Ill. 2d 501, 505, 304 N.E.2d 280, 282). Our review of the record here discloses that this burden was not sustained. Concerning the entry by the police, defendant testified at the hearing on the motion to quash that his father opened the door and, although he said the police then rushed in, he did not say (nor was he asked) whether the entry was consensual. Defendant's roommate (Renee Jones) said that she heard defendant's sister say, "Let [the police] in." Officer Yucaitis testified that he heard knocking on the front door and the voice of Officer Dignan saying, "Police officers" and that in a short time he and his partner were "allowed entry" through the rear door.

■■ Additionally, in considering a ruling upon a motion to suppress, a reviewing court may consider evidence during trial after the conclusion of the suppression hearing. (*People v. Braden* (1966), 34 Ill. 2d 516, 216 N.E.2d 808; *People v. Turner* (1976), 35 Ill. App. 3d 550, 342 N.E.2d 158.) Here, the only testimony during trial as to entry came from Officer Dignan, who stated that after he knocked on the door and announced his office, the door was opened by defendant's father; that he (Dignan) identified himself and said that defendant was wanted by the police; that defendant's father at first "said nothing" and then denied that defendant was there; and that when a small child indicated defendant was in the bedroom, he (Dignan) "covered the bedroom and asked investigator Bennett to go to the back door and get the other two investigators." Thus, it appears that there is no testimony from any witness, either at the hearing or subsequently at trial, that the officers entered defendant's home without consent to do so.

Moreover, we believe exigent circumstances existed which militated against delay and justified the officer's decision to proceed without a warrant. As stated in *People v. Sakalas* (1980), 85 Ill. App. 3d 59, 65-66, 405 N.E.2d 1121, 1127:

> " 'The following have been enumerated as factors to be considered in determining whether exigent circumstances exist:
> "(1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect 'is reasonably

believed to be armed'; (3) 'a clear showing of probable cause * * * to believe that the suspect committed the crime'; (4) 'strong reason to believe that the suspect is in the premises being entered'; (5) 'a likelihood that the suspect will escape if not swiftly apprehended'; and (6) the peaceful circumstances of the entry." [Citations.]' "

Also, in *People v. Abney* (1980), 81 Ill. 2d 159, 169-72, 407 N.E.2d 543, 547-49, our Illinois Supreme Court stated, in reaching a determination that exigent circumstances existed, that "certain factors are worthy of special mention," as follows:

"First, the officers' decision to proceed to defendant's residence without a warrant immediately followed receipt of the victim's statement only 1-1/2 hours after the beating. The receipt of such information about a relatively recent offense could suggest to the officers a need for prompt action. * * *

Second, and closely related to the fact that the officers acted promptly, there was no deliberate or unjustified delay by the officers during which time a warrant could have been obtained. * * *

Finally, the need for prompt action was further made apparent by the belief that the suspect was armed and exhibited some sign of a violent character. * * *

In addition to the exigent circumstances set forth above, other factors were present which suggest that the officers acted reasonably. First, the officers were acting on 'a clear showing of probable cause' [citation] based on the type of 'reasonably trustworthy information' [citations] necessary to justify warrantless law enforcement activities. * * * Second, defendant was clearly identified as the assailant. * * * Third, the victim's statement created strong reason to believe that defendant was in the premises entered. * * * Finally, the entry here was peaceful."

■■ In the instant case, we believe that exigent circumstances were sufficiently shown under both *Sakalas* and *Abney*. The officers went to the residence of defendant on September 25 immediately after Benny Liggins identified defendant as the man who had shot him two months earlier. Liggins also told the officers that his assailant was from the neighborhood and was known as "Cody." The officers also knew when they went to the residence of defendant that Steven Taylor had been shot to death in the early evening of September 21; that a person wanted for that shooting was named "Cody"; that defendant's car had been stopped by the police early in the evening of September 21 in the area of the Taylor homicide; and that defendant's rap sheet disclosed that he had

previously used the name of "Cody." Thus, it appears that the officers were aware not only that defendant had been identified as the person who shot Liggins but also that he was a suspect in the killing of Taylor; that they could reasonably believe he was armed; that because they went to defendant's home at about 9:30 in the morning, it could be expected that he was on the premises; that because of defendant's apparent involvement in two shootings, it was not unreasonable for the police to believe that he might escape if not swiftly apprehended; and that the circumstances of their entry was peaceful. Moreover, as stated in *Abney*, it is significant that the officers proceeded to defendant's residence immediately upon receipt of information from Liggins, with no deliberate or unjustified delay during which time a warrant could have been obtained.

Defendant next contends that he was deprived of a fair trial by the introduction of evidence that he twice attempted to escape from custody. Specifically, he maintains that because the attempted escapes occurred after he was convicted of armed robbery and sentenced to four to six years' imprisonment, they do not "undeniably reflect a consciousness of guilt" of the crime charged herein.

■■ Evidence of escape or attempted escape of an accused is admissible as a fact raising a presumption of guilt of the crime charged (*People v. Harris* (1972), 52 Ill. 2d 558, 288 N.E.2d 385; *People v. Gambino* (1957), 12 Ill. 2d 29, 145 N.E.2d 42, *cert. denied* (1958), 356 U.S. 904, 2 L. Ed. 2d 582, 78 S. Ct. 566; *People v. Curtis* (1972), 7 Ill. App. 3d 520, 288 N.E.2d 35), notwithstanding the fact that the accused is being held on more than one charge (*People v. Sheridan* (1977), 51 Ill. App. 3d 963, 367 N.E.2d 422, *cert. denied* (1978), 435 U.S. 975, 56 L. Ed. 2d 68, 98 S. Ct. 1622; *People v. Ligon* (1973), 15 Ill. App. 3d 746, 305 N.E.2d 212; *People v. Neiman* (1967), 90 Ill. App. 2d 337, 232 N.E.2d 805), and "the fact that defendant is being held on more than one charge should only go to the weight of the inference to be drawn from the fact of the escape attempt since the defendant may offer any proof which would explain the circumstances surrounding his escape or escape attempt" (*People v. Wilson* (1980), 87 Ill. App. 3d 693, 698, 409 N.E.2d 344, 348; *Sheridan*, 51 Ill. App. 3d 963, 967, 367 N.E.2d 422, 425).

■■ Although evidence of defendant's escape attempts does not "undeniably reflect a consciousness of guilt" on the murder charge, it (along with the other proof of guilt) was properly considered by the jury. (*Gambino*; *Curtis*.) The fact that defendant's attempted escapes took place after the October 25, 1977, sentencing on the armed robbery conviction merely goes to the weight of the inference to be drawn.

Defendant also challenges certain remarks made by the prosecutor during rebuttal argument which he claims denied him a fair trial. The

first of these concerns comments that the defense was setting up a "smoke screen" to "confuse and mislead" the jury by calling the victim's daughter to testify.

■■ Similar prosecutorial references have been held to be not prejudicial. (See, *e.g., People v. Palmer* (1970), 47 Ill. 2d 289, 265 N.E.2d 627, *cert. denied* (1971), 402 U.S. 931, 28 L. Ed. 2d 866, 91 S. Ct. 1532 (defense counsel accused of attempting to raise a smoke screen); *People v. Weatherspoon* (1978), 63 Ill. App. 3d 315, 379 N.E.2d 847 (defense counsel's argument characterized as "a smoke screen," "a snow job," and an attempt to confuse the jury); *People v. Madden* (1978), 57 Ill. App. 3d 107, 372 N.E.2d 851 (defense counsel accused of "blowing smoke"); *People v. Smith* (1977), 53 Ill. App. 3d 395, 368 N.E.2d 561 (jury asked, "Now, isn't that [a particular trial strategy of defendant] a smoke screen?"); *People v. Griggs* (1977), 51 Ill. App. 3d 224, 366 N.E.2d 581 (claim that defense was trying to "throw up a smoke-screen" and "to cloud the whole issue").) We find no prejudicial error arising from the statements of the prosecutor in the instant case. They appear to have been in response to the argument of defense counsel that defendant could probably have left his palm prints on the door if he had been the stranger the victim's daughter had seen earlier on the evening of the murder and, in any event, they were not accusations that the defense was perpetrating a fraud on the jury. Accordingly, these remarks did not deprive defendant of a fair trial. *People v. Mayfield* (1979), 72 Ill. App. 3d 669, 390 N.E.2d 1315; *Weatherspoon.*

Additionally, defendant complains of the prosecutor's statement that "a man in Mr. Robinson's profession can do four to six [years in the penitentiary] standing on his head." Although in closing argument the prosecutor may comment unfavorably upon the defendant if the argument is based on competent and pertinent evidence (*People v. Lewis* (1979), 75 Ill. App. 3d 259, 393 N.E.2d 1098; *People v. Carbona* (1975), 27 Ill. App. 3d 988, 327 N.E.2d 546, *cert. denied* (1976), 424 U.S. 914, 47 L. Ed. 2d 319, 96 S. Ct. 1114), prosecutorial remarks suggesting that defendant is a "professional" criminal are improper (*People v. Sheridan* (1978), 57 Ill. App. 3d 765, 373 N.E.2d 669; *People v. Gillarm* (1976), 41 Ill. App. 3d 174, 353 N.E.2d 280). However, while a defendant is entitled to a trial free from improper remarks or arguments, his conviction will not be disturbed on appeal unless such comments either "(1) constitute a material factor in his conviction or (2) result in substantial prejudice to the accused." *People v. Witted* (1979), 79 Ill. App. 3d 156, 165, 398 N.E.2d 68, 76; *People v. Franklin* (1976), 42 Ill. App. 3d 408, 415, 355 N.E.2d 634, 641.

■■ Here, the prosecutor's remark was not a material factor in the convictions in view of the clear evidence establishing defendant's guilt;

namely, the physical evidence and the corroborated testimony of Leroy White. Indeed, defendant does not even argue that his guilt was not proved beyond a reasonable doubt. Thus, we see no substantial prejudice by the remarks, particularly since defense counsel in closing argument said that defendant "is an armed robber convicted of armed robbery."

For the above stated reasons, the murder conviction of defendant is affirmed.

Affirmed.

LORENZ and WILSON, JJ., concur.